# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DJUAN DONTIZE LE BOURGEOIS,**
         **Plaintiff,**

         **v.**                                    **Case No. 17-C-1375**

**NATHAN WOLF, et al.,**
         **Defendants.**

_____

## DECISION AND ORDER

Plaintiff Djuan Dontize LeBourgeois is a Wisconsin state prisoner who is representing himself. He alleges claims against three correctional officers based on their searching his cell, finding what they believed to be contraband, and charging him with disciplinary rules violations. They also ordered destruction of the contraband. One item of contraband was the plaintiff's religious text. The plaintiff brings claims for retaliation against him for exercising his First Amendment rights, violation of procedural due process, and violation of his right to freely exercise his religion. Before me now is the defendants' motion for summary judgment.

## I.       BACKGROUND

At the time of the events giving rise to this suit, the plaintiff was an inmate at Waupun Correctional Institution. Currently, he is confined at Kettle Moraine Correctional Institution.

On June 5, 2015, defendants Timothy Price and Nathan Wolf conducted a search of the plaintiff's cell, which he shared with another inmate. The defendants found the following items:

- three boxes of cubed sugar;

- one snack bag containing bread dough which was inside a bag with the plaintiff's name on it;
- thirteen magazines with another inmate's cell number on them;
- two books that did not bear the plaintiff's name and cell number;
- six oranges and three apples;
- a foot bath;
- a damaged fan;
- two full sized trash bags; and
- a bag of blue yarn.

The plaintiff's possession of some of these items suggested that he intended to make "hooch," which is bootleg alcohol made by fermenting fruit and sugar using the yeast in bread dough. The plaintiff's possession of these items also violated prison rules. The plaintiff could not possess the sugar without a canteen receipt, which he did not have. A prisoner is not permitted to keep bread dough in his cell. The plaintiff's possession of the magazines was not allowed because they belonged to a different inmate. Although inmates may keep some fruit in their cells, nine pieces of fruit exceeds the limit. The foot bath was not allowed because the plaintiff needed authorization from the health-services unit to possess it, which he did not have. The damaged fan was not allowed because prison rules deem any damaged property contraband. Full-sized trash bags are also contraband. The yarn was deemed contraband because inmates may possess hobby supplies only if they post a "hobby slip" on their cell wall, which the plaintiff failed to do.

As for the books, they were deemed contraband because, under prison rules, an inmate must write his name and inmate number on any book in his possession. *See*

West Decl. ¶ 5[1]; Ex. 1002 at 9 (ECF No. 51-2 at p. 14 of 53). The defendants explain that the purpose of this rule is to discourage inmates from stealing books belonging to other inmates or strong-arming them into surrendering their books. The defendants state that if they find an inmate with a book bearing someone else's name or no name at all, they will assume that the inmate acquired the book in an impermissible, possibly dangerous, manner. *See* Defs.' Prop. Findings of Fact ("PFOF") ¶ 14.

After Wolf and Price finished their search and confiscated the plaintiff's property, they interviewed him and his cellmate. According to the plaintiff, Wolf and Price wanted him to either admit to making hooch or identify the other inmates that may have been involved in the hooch-making operation. *See* Le Bourgeois Dep. at 18–20, ECF No. 43. Based on what they found in the plaintiff's cell, Wolf and Price had enough evidence to charge him with misconduct. However, according to the plaintiff, they told him that if he confessed to making hooch and identified the other inmates involved, they would let him go scot-free. *Id.* at 18–20. The plaintiff refused to confess or implicate other inmates. During the interview, the plaintiff told Wolf and Price that one of the books they had confiscated—the Egyptian Book of the Dead—was his religious text. (The plaintiff is a

---

[1] In her declaration, Kelli Willard West, the DOC's Religious Practices Coordinator, states that the DOC policy covering possession of personal property as of June 2015 includes the following provision: "Inmates  shall write their full name and DOC number on the inside cover of all allowable publications they are issued." West Decl. ¶5. West's declaration refers to a version of the policy that became effective on March 12, 2014, but that version is not in the record. The version that is in the record became effective on August 31, 2010, and it does not contain the provision at issue. *See* ECF No. 51-3. The current version of the policy, which I located on the DOC's website, contains the provision at issue. For now, I will assume that the March 2014 version also contained the provision. But I will direct defendants' counsel to file the version of the policy referred to in West's declaration.

follower of Kemetism, a revival of Ancient Egyptian religion.) He said that even though his name was not written on the book, he could produce a receipt for it and a DOC form allowing him to possess it. The plaintiff asked to have his personal property returned to him, but Wolf and Price said no and concluded the interview.

The next day, the plaintiff spoke to the third defendant, Lieutenant Andrew Larson. He told Larson about his property and asked if he knew what was going on. The plaintiff was primarily concerned about getting his religious text and hobby supplies back. According to the plaintiff, Larson told him that he would talk to Price. Later, the plaintiff saw Larson and asked him if he had spoken to Price. Larson told the plaintiff that he should tell Price what he wanted to know and that if he did not, Larson would "hear the ticket" and find the plaintiff guilty. Le Bourgeois Dep. at 21–22. When the plaintiff asked, "What about my book?" Laron told him, "If I find you guilty everything is getting destroyed." *Id.* at 22.

That evening, Price returned to the plaintiff's cell and asked him if he had anything he wanted to tell him. When the plaintiff said no, Price left. A short time later, a different officer (not a defendant) came to the plaintiff's cell to inform him that he was receiving a conduct report and to take his statement. The plaintiff dictated a statement to this officer.

The conduct report was written by Wolf. It charged the plaintiff with four "minor" offenses: disobeying orders, damage or alteration of property, unauthorized transfer of property, and possession of contraband. *See* Exhibit 1001, ECF No. 51-1. Under DOC rules, when an inmate is charged with a minor offense and the inmate contests the charges, the conduct report proceeds as a "contested minor" under Wisconsin

Administrative Code § DOC 303.77 (2015).[2] Under that rule, an inmate does not receive a formal hearing. Instead, prison staff informs the inmate of the nature of the alleged infraction and offers the inmate an opportunity to provide a statement. The conduct report and the inmate's statement are forwarded to a supervisor for review. The supervisor renders a decision based solely on the conduct report and the statement. If the supervisor finds the inmate guilty, he can impose any of the "minor penalties" listed in Code § DOC 303.70, which include loss of recreation time and loss of other privileges.

In the present case, the plaintiff gave the following statement regarding the conduct report:

> As for the hobby material, I have a hobby card, it was on my shelf. I have no tape to put it on the wall. I have a receipt for my religious text. It was in the book, when the officers searched. I am not supposed to under my religion desecrate sacred text with markings. Muslims are not forced to do so with their Karan or Bible. As for yeast and dough being in bag, I had two unopened snack bags. I had no knowledge of what was in the bags. Some fruit was in both of the bags. Some fruit was mine and my celly's. The fan broke falling off my bed. I had foot tub since 2010. Sugar cubes are allowable on canteen, their not contraband. Not all of it was mine. It was my celly's too.

Def. PFOF ¶ 23.

Defendant Larson was the supervisor who decided the conduct report. He found the plaintiff guilty of the four alleged infractions. He issued a disposition of 20 days' loss of recreation and 20 days' loss of phone privileges. He also ordered that the seized

---

[2] In this opinion, I cite to the 2015 version of the administrative code, which was in effect at the time of the events at issue.

property be destroyed as contraband. The plaintiff appealed the conduct report to the warden, who affirmed the finding of guilt and the disposition on June 11, 2015.

On June 18, 2015, the plaintiff filed an intraprison grievance using the DOC's Inmate Complaint Review System ("ICRS"). The complaint raised several issues. Of relevance here is the plaintiff's claim that Larson was not an impartial decisionmaker because he was involved in the investigation and told the plaintiff that if he did not tell Price what he wanted to know he would find him guilty and have his property destroyed. The plaintiff also claimed that some of the seized property, including his religious text, was not contraband and should have been returned to him. The plaintiff's grievance was denied, and the denial was upheld on appeal through the ICRS.

After exhausting his remedies under the ICRS, the plaintiff commenced this action under 42 U.S.C. § 1983 and state law against Wolf, Price, Larson, William Pollard (the Warden of Waupun Correctional Institution), and Edward Wall (the Secretary of the Wisconsin Department of Corrections at the time) In screening the complaint under 28 U.S.C. § 1915A, I allowed the plaintiff to proceed on several claims: (1) a claim that he was not provided with procedural due process during the disciplinary proceeding; (2) a claim that Wolf and Price retaliated against him for refusing to provide false testimony; (3) a claim that Wolf and Price violated the plaintiff's Fifth Amendment rights, and (4) a state-law tort claim for compensation for the destruction of his property. In my screening order, I dismissed Warden Pollard and Secretary Wall because the plaintiff had not adequately alleged that they were personally involved in the events at issue. I also found that the complaint failed to state a claim that the seizure and

destruction of the plaintiff's religious text violated the Free Exercise Clause of the First Amendment.

After I screened the complaint, the plaintiff filed an amended complaint against Wolf, Price, and Larson. I allowed the amendment and then screened the new complaint under § 1915A. I found that the amended complaint stated the same claims as the original complaint and added a viable claim under the Free Exercise Clause based on the seizure and destruction of the religious text.

The defendants have moved for summary judgment on all claims.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

### A.    Free Speech Retaliation

The plaintiff contends that Wolf and Price wrote the conduct report to retaliate against him for refusing to confess to making hooch and for refusing to divulge the identities of other inmates who may have been involved in bootlegging. The plaintiff contends that such retaliation violated his rights under the Free Speech Clause of the First Amendment because, according to him, prisoners have a right to refuse prison officials' requests to provide false information and a right not to act as a "snitch."

I will assume, without deciding, that the First Amendment prohibits prison officials from compelling an inmate to provide testimony that those officials know is false. However, no evidence in the record suggests that either Wolf of Price tried to force the plaintiff to make statements that they knew were false. The defendants found ingredients for making hooch in the plaintiff's cell. Moreover, the bread dough—which the plaintiff had no legitimate reason to possess—appeared to have been sent to him by someone else in the prison. This was so because the dough was inside a "snack bag" with the plaintiff's name on it, and snack bags are delivered to inmates by other inmates. *See* Le Bourgeois Dep. at 11. Thus, the defendants had reason to think that the plaintiff was trying to make hooch and that he was conspiring with other inmates to do so. Therefore, in seeking his confession and his help in identifying the other inmates involved, the defendants could not have been seeking testimony they knew was false.

The Second Circuit has held that an inmate has a First Amendment right not to be compelled to serve as a prison informant on an ongoing basis. *See Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018). That case was decided after the events giving rise to this suit, and so, based on qualified immunity, the defendants could not be found liable for damages under its holding. But I note that the holding does not apply to the facts of this case. In *Burns*, the Second Circuit found that a clearly innocent inmate cannot be compelled to serve as an informant against other inmates on an ongoing basis. *See id.* at 890 F.3d at 93 (finding "no indication that [the plaintiff] himself was engaged in wrongful conduct"). The court distinguished its holding from "the widespread practice of conditioning pleas or other favorable prosecutorial treatment on the provision of information." *Id.* The court reasoned that when the government offers relief from

8

warranted criminal prosecution in exchange for information, and the accused declines the offer, the government does not engage in First Amendment retaliation when it then proceeds with the prosecution. *Id.*

In the present case, the conduct of which the plaintiff accuses Wolf and Price is analogous to conditioning favorable prosecutorial treatment on the provision of information. Wolf and Price had enough evidence to write the plaintiff a conduct report for possession of contraband. They also reasonably suspected that the plaintiff was trying to make hooch and that other inmates were involved in the attempt. Wolf and Price thus could legitimately offer the plaintiff leniency if he provided information about the hooch-related activities of other inmates. When the plaintiff refused to either confess or implicate other inmates, Wolf and Price could proceed with the conduct report without being deemed to have retaliated against the plaintiff for exercising his First Amendment rights.

For these reasons, I will grant summary judgment to the defendants on the plaintiff's claim for retaliation based on his refusing to make false statements or provide information about other inmates.[3]

## B. Procedural Due Process

The plaintiff claims that he did not receive due process during the disciplinary proceeding relating to his conduct report. The plaintiff notes that, under *Wolff v.*

---

[3] In my screening order, I allowed the plaintiff to proceed on a claim that Wolf and Price violated the plaintiff's Fifth Amendment right against self-incrimination. The defendants have moved for summary judgment on this claim, and the plaintiff did not address the claim in his brief in opposition. Thus, I assume he concedes that the defendants are entitled to summary judgment on the Fifth Amendment claim, and I will grant summary judgment to the defendants on this claim.

*McDonnell*, prison disciplinary hearings must meet the following requirements to satisfy the Due Process Clause: (1) written notice of the charge against the prisoner, given at least twenty-four hours prior to the hearing; (2) the right to appear in person before an impartial hearing body; (3) the right to call witnesses and to present documentary evidence, when to do so will not unduly jeopardize institutional safety or correctional goals; and (4) a written statement of reasons for the disciplinary action taken. 418 U.S. 539, 563-67 (1974); *see also Black v. Lane*, 22 F.3d 1395, 1402 n.9 (7th Cir. 1994). The plaintiff contends that his disciplinary proceeding did not include any of these safeguards, but he focuses primarily on the lack of an impartial decisionmaker. He contends that Larson was not an impartial decisionmaker because he had previously involved himself in the investigation by warning the plaintiff to tell Price what he wanted to know and threatening to hear the conduct report, find the plaintiff guilty, and order the destruction of his property.

An initial question is whether the *Wolff* requirements apply to the plaintiff's conduct report. Generally, these requirements apply when a disciplinary hearing may result in the loss of a liberty interest. *See, e.g., Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019); *see also Stallings v. Best*, 777 F. App'x 831, 832 (7th Cir. 2019) (noting that *Wolff* procedures must be used "[b]efore prison officials may deprive a prisoner of liberty for misconduct"). In the present case, the discipline imposed on the plaintiff was the loss of recreation for 20 days and the loss of phone privileges for 20 days. In a prison setting, this level of discipline is rather slight and could not be viewed as the kind of "atypical and significant hardship" that results in a deprivation of liberty. *See Sandin v. Connor*, 515 U.S. 472, 484 (1995). Courts have found that discipline consisting of

months-long stays in segregation does not implicate a liberty interest. *See, e.g., Lisle*, 933 F.3d at 721 ("A sentence of four months in segregation for the discovery of contraband is not so atypical and significantly harsh that it creates a liberty interest."). Given such findings, the plaintiff's loss of recreation and phone for 20 days could not have resulted in a deprivation of liberty. Thus, the plaintiff was not entitled to receive the process outlined in *Wolff* before being subjected to those minor restrictions.

Although the plaintiff was not deprived of a liberty interest, the actions of the defendants resulted in the destruction of his property, and so I must consider whether he was deprived of a property interest. The defendants note that all the property at issue was deemed to be contraband, and they cite cases indicating that a prisoner does not have a protectable property interest in contraband. *See, e.g., Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984); *see also Ziffrin, Inc. v. Reeves*, 308 U.S. 132, 140 (1939), *abrogated on other grounds by Granholm v. Heald*, 544 U.S. 460 (2005) (noting that property rights cease when property becomes contraband). I agree that a prisoner does not have a property interest in contraband. Moreover, it is clear that much of the plaintiff's property was contraband. However, the plaintiff disputes that his religious text and hobby supplies were contraband. But even if they were not and the plaintiff had a property interest in them, he has not shown that he was deprived of due process.

The plaintiff has not cited, and I have not found, a case holding that a prisoner must receive the process outlined in *Wolff* before prison officials deprive him or her of a property interest in items believed to be contraband. Indeed, I have found no case suggesting that an inmate is entitled to receive any "predeprivation" process at all before being deprived of alleged contraband. Moreover, to the extent that an inmate is

entitled to some amount of process after the property is seized but before it is destroyed, the procedures for a contested minor disposition in § DOC 303.70 would likely suffice. Here, however, the plaintiff alleges that the person who decided his contested minor disposition, Larson, was biased. I will assume without deciding that Larson was biased and that therefore the plaintiff did not receive the process afforded by § DOC 303.70.

Still, Larson's alleged bias would have been "random and unauthorized," and thus no due-process violation would have occurred unless Wisconsin did not provide adequate post-deprivation remedies. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (holding that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."). Here, the defendants contend that Wisconsin provides adequate postdeprivation remedies through the ICRS and common-law tort claims such as conversion and trespass to personal property. The plaintiff disputes that the ICRS is an adequate postdeprivation remedy. *See* Br. in Opp. at 8–9, ECF No. 55. But he does not dispute that tort claims were available to compensate him for the destruction of his property. *See also Streckenbach v. Vandensen*, 868 F.3d 594, 597 (7th Cir. 2017) ("Wisconsin allows many kinds of tort claims against the state."); *Greeno v. Litscher*, 13 F. App'x 370, 376–77 (7th Cir. 2001) (finding that Wisconsin law provides adequate postdeprivation remedies to prisoners whose property is converted or damaged by prison officials). Indeed, the plaintiff brought just such a tort claim against the

defendants as part of this action.[4] Accordingly, I find that the plaintiff had adequate postdeprivation remedies through which he could have recovered the value of his property, and that therefore Larson's alleged bias did not result in a denial of due process.

## C.    State Tort Claims

The plaintiff alleges that the defendants are liable to him in tort for destroying his property. However, the defendants have shown that the plaintiff did not comply with Wisconsin's notice-of-claim statute, Wis. Stat. § 893.82(3). *See* Def. PFOF ¶ 43. The plaintiff does not dispute that he failed to comply with the statute, and he does not argue that he may proceed with his tort claims despite his failure to comply with the statute. Accordingly, I will grant summary judgment to the defendants on the tort claims.

## D.    Religion Claims

The plaintiff makes two arguments under the Free Exercise Clause concerning the confiscation and destruction of his religious text. First, he alleges that the defendants intentionally targeted his religious text to substantially burden his religious practice. Second, he contends that the prison should have accommodated his religious beliefs by exempting him from the requirement that he write his name and prison number on the text.

---

[4] As discussed below, the plaintiff failed to file a timely notice of claim in connection with his state tort claims, and therefore the defendants are entitled to summary judgment on them. The plaintiff's failure to properly prosecute his tort claims does not render the state's postdeprivation process inadequate. *See Tyler v. Wick*, 680 F. App'x 484, 485 (7th Cir. 2017) (finding state postdeprivation remedy adequate even though plaintiff failed to pursue that remedy properly by filing a timely notice of claim).

### 1. Intentional Religious Discrimination

The Free Exercise Clause of the First Amendment forbids prison officials from intentionally and substantially interfering with an inmate's ability to practice his faith unless the restriction is reasonably related to a legitimate penological interest. *Garner v. Muenchow*, 715 F. App'x 533, 536 (7th Cir. 2017) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). In the present case, the defendants do not dispute that they intentionally deprived the plaintiff of his religious text and ordered its destruction. It is clearly established that denying an inmate access to his religious text substantially interferes with his ability to practice his faith. *Id.* However, the defendants contend that their actions were lawful because they served a legitimate penological interest, namely, enforcing the prison's rules involving the possession of property and contraband.

As discussed in the background section, under prison rules, an inmate may not possess any book—religious or secular—that does not have his name and inmate number printed on it. The purpose of the rule is to discourage inmates from stealing property from each other or strong-arming inmates into surrendering their property. Given this rule, an inmate who possesses a book that does not bear his name and number possesses contraband. *See* Wis. Admin. Code § DOC 309.20(7) (an institution "shall consider items not permitted at an institution . . . contraband and subject the items to seizure and disposition"). Thus, when the defendants seized and disposed of the plaintiff's religious text, they were enforcing legitimate penological purposes—removing contraband from the prison and preventing property theft and inmate violence.

The plaintiff contends that no prison rule designates a book that does not bear a name and number contraband. It is true that no prison rule specifically states that "a

book without a name and number written on it is contraband." But the plaintiff does not dispute that prison rules required him to write his name and number on his allowable publications. *See* Br. in Opp. at 5, ECF No. 55 (conceding that prison rules state "[i]nmates shall write their full names and DOC number on the inside cover of all allowable publications that are issued"). Thus, the plaintiff concedes that a book that does not bear an inmate's name and number is not permitted in the institution. The DOC's rule governing inmate personal property, Wis. Admin. Code § DOC 309.20(7), states that "items not permitted at an institution" are contraband. Moreover, a disciplinary rule states that an inmate who possesses "[i]tems which are not allowed" is guilty of possession of contraband. *See id.* § DOC 303.47(2)(a). Accordingly, the plaintiff's religious text was properly classified as contraband.

The plaintiff suggests that, even if, under the written policy, the book was contraband, the defendants went out of their way to target his property to punish him for refusing to provide information about bootlegging. However, as discussed above, the First Amendment does not prohibit prison officials from prosecuting disciplinary violations after an inmate declines their offer for leniency in exchange for information. Moreover, in seeking information from the plaintiff, the defendants would have been acting in furtherance of a legitimate penological purpose—detecting inmates who were making hooch. Thus, even if the defendants might have treated the plaintiff's property more favorably had he cooperated with their investigation, they did not violate the Free Exercise clause by disposing of his property in accordance with the DOC's written policies when he refused to cooperate.

Things would be different if there were evidence in the record suggesting that the defendants targeted the plaintiff's religious text in order to discriminate against him on the basis of his religion. But I do not understand the plaintiff to be arguing that Wolf, Price, or Larson wanted to discriminate against followers of Kemetism, against followers of non-mainstream religions, or against religion generally. Moreover, the defendants treated all the plaintiff's property—both religious and secular—the same. The plaintiff notes that, when Wolf and Price searched his cell, they did not seize several secular books that did not bear his name and inmate number. Br. in Opp. at 6. However, these defendants must have seized at least one of the plaintiff's secular books, for he concedes that they seized two books and does not contend that the other had religious significance. *See* Am. Compl. ¶ 16, ECF No. 18. In addition, Wolf and Price seized the plaintiff's magazines and hobby supplies, which were not religious. Thus, the record does not suggest that the defendants singled out the plaintiff's religious text for unfavorable treatment or otherwise wanted to punish the plaintiff for practicing his religion.

For these reasons, I will grant summary judgment to Wolf, Price, and Larson on the plaintiff's claim that they intentionally burdened his religious practice without a legitimate penological purpose when they treated his religious text as contraband.

### 2.    Religious Accommodation

As discussed in the prior section, a prison rule requires inmates to write their name and inmate number on their publications. The plaintiff contends that this rule substantially burdens his religious practice because, under his faith, he may not desecrate his religious text by writing on it. This implies that the plaintiff may be seeking

a religious accommodation from a generally applicable prison rule. In his complaint, the plaintiff did not expressly allege a claim for a religious accommodation, and, when I screened the complaint, I did not allow him to proceed on such a claim. However, the plaintiff's arguments imply that he is making an accommodation claim. And, because I have an obligation to construe pro se filings liberally, I will now consider whether the plaintiff should be permitted to proceed on an accommodation claim.

The defendants contend that the plaintiff has not exhausted his prison remedies relating to a religious accommodation. *See* 42 U.S.C. § 1997e(a). They claim that, to request an accommodation, the plaintiff had to file a form with the prison chaplain known as "DOC-2075." According to the defendants, use of this form "allows staff members with specialized knowledge and experience at the institution and Division of Adult Institutions levels an opportunity to review the request, consider options for accommodation, consult with religious advisors and security personnel, and advise the facility Warden based upon the totality of available information." Def. PFOF ¶ 35.

It is undisputed that the plaintiff did not file a Form DOC-2075 requesting that he be allowed to possess a copy of the Book of the Dead without his name and inmate number printed on it. But the plaintiff contends that no prison policy clearly states that a request for an accommodation must be made using Form DOC-2075. He also states that the institution chaplain—the official who would have processed the form—told him that he did not need to apply for an accommodation because he was not required to write his name on the text if doing so would violate his religious beliefs. *See* Le Bourgeois Dep. at 31–32, ECF No. 43; Le Beourgeois Decl. ¶¶ 26–29, ECF No. 58. The

chaplain also told him that Muslim inmates are not required to write their names on their Quarans.[5]

In order to sustain a lack-of-exhaustion defense, prison officials must show not only that a prison remedy was available to an inmate, but also that the inmate reasonably should have known that the remedy was available. "Prisoners are required to exhaust grievance procedures they have been told about, but not procedures they have not been told about. They are not required to divine the availability of other procedures." *King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015).

Here, I find that the plaintiff's testimony creates a genuine factual dispute about whether he reasonably should have known that he needed to file Form DOC-2075 to obtain an exemption from the name and inmate-number requirement. The policy requiring use of the form states that the form must be submitted to the chaplain "when requesting authorization for a property item not on the approved property list." *See* Ex. 1004 at 6, ECF No. 53-1 at p. 6 of 7. The policy does not state that the form is to be used when seeking an exemption from a prison rule that would apply to an allowed property item. Here, the plaintiff was seeking an exemption from the name and inmate-number requirement, not permission to possess an item of religious property that was not on the approved property list. Moreover, at this stage of the case, I must accept the plaintiff's testimony about what the chaplain told him as true. Thus, viewing the

---

[5] The defendants contend that the plaintiff's testimony about what the chaplain told him his hearsay. However, in this context, the statement is not being offered for the truth of the matter asserted, *i.e.*, that the plaintiff was not required to file the form. Instead, the statement is being offered to show that the chaplain told the plaintiff that he did not need to file the form. This is relevant to the plaintiff's claim that he reasonably believed that he did not need to file the form.

evidence in the light most favorable to the plaintiff, I conclude that the defendants have not shown that the need to use Form DOC-2075 was adequately communicated to the plaintiff. They therefore are not entitled to summary judgment on exhaustion grounds.

Turning to the merits, I first note that the current defendants—Wolf, Price, and Larson—are likely not the proper defendants to a religious accommodation claim. These defendants had no authority to grant religious exemptions from prison policies and rules. Instead, the proper defendants would be the prison officials responsible for promulgating prison policies and granting exemptions. Most likely, this would be the warden of the institution or a central administrator for the DOC. When the plaintiff filed this case, he named the warden of his institution as well as the Secretary of the DOC. However, I dismissed these defendants at screening for lack of personal involvement. At the time, I did not understand the plaintiff to be seeking a religious accommodation. But with the benefit of the summary-judgment record, I see that the plaintiff's complaint could be construed as stating a claim for a religious accommodation. Thus, perhaps the warden or the secretary should be reinstated as defendants and served with the complaint.

A related question is whether the complaint should be construed to state a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. RLUIPA would permit the plaintiff to proceed on a claim for injunctive relief against the defendants in their official capacity. *See Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012). The plaintiff cited § 2000cc-1 in his original complaint, *see* ECF No. 1 at p. 5 of 6, and courts generally interpret complaints alleging a free-exercise claim to include a claim under RLUIPA. *See Neely-Bey Tarik-El v. Conley*, 912 F.3d

989, 1004 (7th Cir. 2019); *Grayson*, 666 F.3d at 451. But it is not clear whether the plaintiff still seeks injunctive relief. Since he filed his complaint, the plaintiff was transferred to a different institution, and perhaps that institution would allow him to possess his religious text without writing his name on it. But the policy at issue applies to the entire Division of Adult Institutions, and no evidence suggests that the plaintiff is currently allowed to possess the text without writing his name in it. Thus, at this point, I will assume that the plaintiff seeks injunctive relief under either § 1983 or RLUIPA.[6]

I could bypass the issues of identifying the correct defendants and proper claims if it were clear that the plaintiff is not entitled to an accommodation. But at this stage, I cannot say that. Under RLUIPA, the appropriate defendants would have to show that requiring the plaintiff to write his name on his religious text was the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-1(a). Although I agree that the general rule requiring inmates to write their names and inmate numbers on their books serves a legitimate penological purpose, it does not follow that granting exemptions for religious texts would undermine that purpose. So far, no evidence shows that theft of religious texts is a serious issue inside prisons. Moreover, even if prison officials needed to deter such theft, they might be able to do so in ways that did not require religious adherents to desecrate sacred texts. For example, the officials could maintain a list showing which inmates owned which religious texts. If an inmate was found with a text not on his list, then prison officials could assume that he obtained it by improper means.

---

[6] Because the plaintiff has been transferred, it might be appropriate to allow him to amend his complaint to name the warden of his current institution as a defendant.

For these reasons, I cannot grant summary judgment on the plaintiff's claim for a religious accommodation. Although Wolf, Price, and Larson may not be the proper defendants to this claim, I will keep them as parties to the case until the proper defendants have been identified and served. *See Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548, 555–56 (7th Cir. 1996) (district court has obligation to assist pro se plaintiff in identifying proper defendants). Moreover, I will set this case for a status conference to determine whether the plaintiff continues to seek injunctive relief and, if he does, to schedule further proceedings for identifying the appropriate defendants. Although the plaintiff might also want damages for the defendants' failure to accommodate his religious beliefs at the time they seized and destroyed his text, damages are not available under RLUIPA. *See Grayson*, 666 F.3d at 451. Damages are available under § 1983 for a violation of the Free Exercise Clause, but at this point it is unclear whether the Free Exercise Clause grants a prisoner a right to a religious accommodation. *See id.* at 452–53 (noting seeming conflict between *O'Lone v. Shabazz*, 482 U.S. 342 (1987) and *Employment Division v. Smith*, 494 U.S. 872 (1990)); *Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013) (same). Thus, even if it turns out that the Free Exercise Clause grants a prisoner a right to a religious accommodation, the defendants likely would have qualified immunity from damages. However, at this point, I will not grant summary judgment on the claim for damages but will leave the issue for resolution after the appropriate defendants have been identified.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 45) is **GRANTED IN PART** and **DENIED IN PART**. The

motion is granted as to the plaintiff's claims based on the Free Speech Clause, the Fifth Amendment, denial of procedural due process, and intentional religious discrimination. The motion is also granted on the plaintiff's state tort claims. The motion is denied as to the plaintiff's request for a religious accommodation.

**IT IS FURTHER ORDERED** that the defendants shall serve and file a copy of the DAI Inmate Personal Property and Clothing Policy referred to in Paragraph 5 of the Declaration of Kelli Willard West that became effective on March 12, 2014.

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held **on April 14, 2020 at 11:30 a.m.** for the purpose of scheduling further proceedings.

Dated at Milwaukee, Wisconsin, this 10th day of March, 2020.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge